Joe Alan TAYLOR, Jr. and Steve Hufstedler  *v.*
Michael HINKLE and Beiife, Inc.

04–471                                           200 S.W.3d 387

Supreme Court of Arkansas
Opinion delivered December 16, 2004

*Barrett & Deacon*, by: *Ralph W. Waddell, D.P. Marshall, Jr.*, and *Andrew H. Dallas*, for appellants.

*W. Frank Morledge, P.A.*, for appellee.

BETTY C. DICKEY, Chief Justice. Alan Taylor and Steven Hufstedler appeal a decision of the St. Francis County Circuit Court finding: (1) that appellants had no reasonable expectation of participation in the management and control of BEIIFE, Inc.; (2) that the corporation's by laws could be amended by the affirmative vote of fifty-one percent of the shares issued and outstanding; and, (3) that the actions of the appellants at the 2000 shareholders/board of directors meeting were a gross abuse of their discretion warranting their removal from the board of directors for a period of two years. Because this appeal involves an issue of first impression and issues of statutory construction, we have jurisdiction pursuant to Ark. Sup. Ct. R. 1-2(b)(1) and (6). We find no error and affirm the trial court.

### Facts

Sometime in 1997, appellants Alan Taylor and Steve Hufstedler learned that Honda was planning to open a new franchise in Forrest City, Arkansas. Taylor is the general manager of J.T. Motorsports, which sells Honda motorcycles and ATVs, in Jonesboro, Arkansas. Hufstedler is also employed by J.T. Motorsports. Taylor's father is the owner of J.T. Motorsports. Taylor currently has no ownership interest in J.T. Motorsports, but expects to inherit the business from his father. Honda has an internal rule which prohibits the ownership of adjacent Honda franchises. Because it, too, believed Taylor would inherit J.T. Motorsports from his father, Honda would not allow him to own the Forrest

City franchise outright, and Hufstedler did not have the money to purchase it. Therefore, Taylor and Hufstedler needed a third party to participate in the franchise with them. Taylor and Hufstedler contacted appellee Michael Hinkle regarding the acquisition of the Forrest City franchise. Hinkle owned a business in Aubrey, Arkansas that sold used ATVs and provided some service work on ATVs.

The three men formed BEIIFE, Inc., an Arkansas "S" Corporation, chartered for the sole purpose of acquiring and operating the Forrest City Honda franchise. Initially, Taylor and Hufstedler were to own 51% of the franchise, and Hinkle was to own the remaining 49%. However, due to philosophical differences as to how the business should be run (for example, Hufstedler said that he and Taylor were going to "go down there, stick it in them [the customers] and break it off"), Hinkle determined that he would not pursue the venture without a 51% interest and control of the corporation. Hinkle's demand led to a meeting at the office of Jack Gentry, the corporation's CPA, in November 1997. Following the meeting, the parties reached an understanding that Hinkle was to have a 51% interest in the company and that he would be in charge of the day-to-day operations of the Forrest City franchise. Later that month, Taylor filed BEIIFE's articles of incorporation.

When the parties met with the Honda representative in December 1997 to sign the franchise papers, they were still arguing about ownership percentages. Honda came to the meeting with the original ownership percentages, and Hinkle refused to sign the papers unless he was given 51% interest. Due to all the disagreements, the Honda representative began packing up to leave the meeting. Because he feared that the deal was about to go under, Taylor agreed to allow the Honda representative to switch the percentages and give Hinkle 51%. Later that day, the parties ratified the articles of incorporation and adopted the corporate bylaws. Honda granted BEIIFE a franchise based on certain conditions. Hinkle was to continue to be the president of the corporation with the authority to make all dealership decisions, and any changes in ownership percentages or dealer manager required Honda's prior written approval.

Although Hinkle, Hufstedler, and Taylor all agreed to contribute $10,000 each to capitalize the corporation, Hinkle was the only one who contributed any funds with which to start the business. Taylor refused to contribute because he got mad when

Hinkle wound up with 51%. Hufstedler followed Taylor's lead and likewise refused to contribute anything. Hinkle and his wife loaned the company over $70,000. In addition, because BEIIFE had no money for equipment, Hinkle had to borrow furniture, tools, equipment, and trucks from his business in Aubrey in order to equip the Forrest City Honda franchise. He leased all of this equipment to BEIIFE for $800 per month, less than it would normally cost to rent one of Hinkle's trucks.

The Forrest City Honda franchise opened for business in 1998 and was an instant success. In 1998, the store had $2,900,000 in sales. The next year, the store recorded 4.3 million in sales. In 2000, the store did 5.1 million dollars worth of business, and the next year's sales increased by $300,000. In 2002, the store made 6.5 million dollars in sales. Despite the financial success of the corporation, Taylor, Hufstedler, and Hinkle were in constant discord. Taylor and Hufstedler wanted to sell an in-house warranty, while Hinkle preferred a factory warranty. Taylor and Hufstedler wanted distributions with which to pay their taxes, whereas Hinkle wanted to reinvest the profits in the corporation. Taylor and Hufstedler's goal was to maximize profits, but Hinkle did not think that maximizing profits to the point of gouging the customers was the proper way to do business.

The conflict reached critical mass at a January 2000 board of directors/shareholders meeting. Taylor began the meeting by passing around a checklist of items that he wanted put before the board, and he criticized Hinkle for not generating enough profits. Despite the requirements and conditions of the franchise agreements wherein Hinkle was to remain president and ownership percentages could not change without prior written approval from Honda, Taylor and Hufstedler ousted Hinkle as the president of BEIIFE and replaced him with Taylor. In addition, Taylor and Hufstedler passed a measure requiring the corporation to open a savings account with a Jonesboro bank and another authorizing the issuance of additional corporate stock, which could not be transferred to a non-shareholder. They also passed a measure allowing shareholders to purchase these shares up to their pro-rata ownership percentages, but the shares could only be purchased with cash, not with debt owed by the corporation. Before Taylor could move the corporation's checkbook and mail from Forrest City to Jonesboro, Hinkle adjourned the meeting.

Shortly after the January 2000 board meeting, Hinkle filed this lawsuit seeking Taylor and Hufstedler's removal from the

board for gross abuse of discretion. He alleged their actions violated the Honda agreement, jeopardizing BEIIFE's franchise. Although the parties originally sought the dissolution of the corporation, those claims were disposed of below, and thus are not before this court.

After a summary judgment hearing in December 2002, the trial court dismissed Hinkle's claim for dissolution and lifted a previous stay order that had forced the parties to maintain the status quo. In January 2003, Hinkle noticed another stockholders/board of directors meeting, with the stated purpose of amending the bylaws: to remove the requirement that every director be a shareholder; to remove Taylor and Hufstedler as directors; and, to vote for directors. Taylor and Hufstedler responded with a new counterclaim seeking to enjoin Hinkle from amending the bylaws or removing them as directors, claiming that Hinkle's actions were oppressive and violated their reasonable expectations of participating in managing BEIIFE. At the meeting, Hinkle voted all 51% of his shares and amended the bylaws, removing the requirement that directors be shareholders. He then voted his stock cumulatively and elected his wife, Janet, and himself to the board. She was the operations manager at the Honda dealership in Forrest City and had done the book work for Hinkle's business in Aubrey. Taylor and Hufstedler pooled their votes to elect Taylor. Relying upon financial advice from Jack Gentry, BEIIFE's CPA, regarding the reasonableness of compensation, Hinkle raised his salary from $39,000 to $75,000. Hinkle also increased the rent BEIIFE paid to Hinkle's ATV for equipment and trucks by $2,700 per month, justifying that increase on solicited bids from third party vendors for the lease of like items. The amount quoted by those vendors was $9,491 per month for equipment and $801.82 per month for just one truck. In response, Taylor and Hufstedler sought a temporary restraining order to enjoin Hufstedler's removal. The trial court denied the motion, noting that the issue could be revisited at trial.

Following a two-day trial, the court held that Taylor and Hufstedler's actions at the 2000 board meeting constituted a gross abuse of discretion as directors and ordered their removal from the board for a two-year period. The trial court further held that neither Taylor nor Hufstedler had a reasonable expectation of participating in the management of BEIIFE, emphasizing that Taylor, Hufstedler, and Hinkle did not have an agreement about control. The trial court also held that Hinkle's amendment of the

bylaws was authorized by corporate documents and that all of the actions taken by the newly elected board were valid. This appeal follows.

### Standard of Review

In bench trials such as this, the standard of review on appeal is not whether there is substantial evidence to support the finding of the court, but whether the judge's findings were clearly erroneous or clearly against the preponderance of the evidence. Ark.R.Civ.P. 52(a) (2004); *Reding v. Wagner*, 350 Ark. 322, 86 S.W.3d 386 (2002); *Shelter Mut. Ins. Co. v. Kennedy*, 347 Ark. 184, 60 S.W.3d 458 (2001). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that a mistake has been committed. *Sharp v. State*, 350 Ark. 529, 88 S.W.3d 348 (2002). Disputed facts and determinations of credibility are within the province of the fact-finder. *Sharp, supra*; *Pre-Paid Solutions, Inc. v. City of Little Rock*, 343 Ark. 317, 34 S.W.3d 360 (2001).

Finally, a court considering a petition alleging oppressive conduct must investigate what the majority shareholders knew, or should have known, to be the petitioner's expectations in entering the particular enterprise. *Smith v. Leonard*, 317 Ark. 182, 876 S.W.2d 266 (1994) (citing, *In re Kemp & Beatley, Inc.*, 64 N.Y.2d 63, 473 N.E.2d 1173 (1984)). Majority conduct should not be deemed oppressive simply because the petitioner's subjective hopes and desires in joining the venture were not fulfilled. *Id.* Disappointment alone should not be equated with oppression. *Id.*

### Closely Held Corporations

Closely held corporations are unique creatures. Because of their small size, these corporations require "close cooperation" and "mutual respect" between shareholders. *Meiselman v. Meiselman*, 307 S.E.2d 555 (N.C. 1983). Shareholders in closely held corporations often reasonably expect their ownership to lead to a position in corporate management or corporate employment. *McCauley v. Tom McCauley & Son, Inc.*, 724 P.2d 232 (N.M. Ct. App. 1986); *see also, Action Cmty. Televison Broad. Network, Inc. v. Livesay*, 564 S.E.2d 566 (N.C. Ct. App. 2002); *Longwell v. Custom Benefit Programs Midwest, Inc.*, 627 N.W.2d 396 (S.D. 2001). As one court put it, "the shareholder in a close corporation considers

himself or herself a co-owner of the business and wants the privileges and powers that go with ownership." *Mueller v. Cedar Shore Resort, Inc.*, 643 N.W.2d 56 (S.D. 2002). "Only in the close corporation does the power to manage carry with it the de facto power to allocate the benefits of ownership arbitrarily among the shareholders and to discriminate against the minority whose investment is imprisoned in the enterprise." *Meiselman, supra,* at 559.

A limited market exists for the shares of closely held corporations because investors are extremely reluctant to buy a non-controlling interest when the majority shareholder wields the power to freeze out the minority. *McCauley, supra.* This limited market share means that the minority shareholders are powerless to vindicate their representative expectations by force and they have no way to escape a bad investment. Because of the potential for oppression, several jurisdictions recognize claims by minority shareholders to vindicate their "reasonable expectations."*e.g Mc-Cauley, supra.* at 236. Construing Arkansas's statute prohibiting "oppressive" conduct by directors, this state, in 1994, joined these jurisdictions. *Smith, supra.* (interpreting Ark. Code Ann.§ 4-26-1108(a)(1)(B)).

### Reasonable Expectations

For their first point on appeal, Taylor and Hufstedler assert that the trial court erred in holding that they had no reasonable expectation in participation in the management of BEIIFE, Inc. We disagree. Despite the fact that the appellants intended to be in control originally, when they were to have 51% of the stock, any expectation of control of the corporation dissipated when Hinkle demanded 51% ownership and control of the day-to-day operations of the company, and both the parties and Honda signed the franchise agreement.

While Taylor and Hufstedler got Hinkle to promise to "consult" with them on all major decisions, indicating an expectation to have some say in managing the corporation, this does not demonstrate that they had an expectation of having an equal say in running BEIIFE, Inc. Furthermore, the minutes of the corporation's annual meeting of shareholder and directors on January 5, 1998, reflected a subjective desire, rather than a reasonable expectation, of having an equal say in managing the corporation. The minutes in question stated:

The shareholders and directors next discussed ownership and voting requirements with respect to the corporation. It was noted that Michael Hinkle has 51% ownership interest, but that the minority shareholders and two directors would like for any decision to be based upon the decision of a majority of the existing shareholders and directors. Counsel for the parties was instructed to give further consideration to the issue.

In addition, there was a series of letters between Taylor and Hufstedler's lawyer and Hinkle's lawyer, which also showed that Taylor and Hufstedler only had a subjective desire of having an equal say in running the company. In a January 7, 1998 letter from Hinkle's lawyer to Taylor's lawyer, Hinkle's lawyer wrote:

Michael Hinkle called me this morning and he told me that after thinking the matter over, he does not wish to relinquish 51% ownership in the corporation . . . Michael does assure me that he does not wish to be in a position of making any major changes or expenditures, but that he feels that he must be free to operate the business. As stated previously, he does agree to be required to give notice before any stockholder action is taken.

On May 13, 1998, Taylor's lawyer wrote Hinkle's lawyer and stated,

I originally forwarded to you a draft of the bylaw amendment back on February 11, 1998. I thought we were in agreement on this issue. It was my understanding that while Michael wanted to retain a majority ownership in the corporation, he was agreeable to corporate decisions being made by a majority vote of all three owners. The bylaw amendment is merely intended to accomplish this goal.

The bylaws already provide that only shareholders may be directors of the corporation. Currently, however, with his majority control, Michael Hinkle could conceivably amend the bylaws to delete this provision, then use his ownership to elect an outside director. All we are intending to do with the bylaw amendment is to make sure that all the owners will remain directors of the corporation, and that they will have an equal voice in any significant decisions regarding the corporate affairs (other than the decisions simply involving day-to-day operations of the business.)

On May 18, 1998, Hinkle's lawyer responded by writing:

I think we have a misunderstanding about the bylaw agreement. The amendment to section five requires a two thirds majority of the outstanding and issued shares to pass any measure. This would defeat the entire purpose of Michael insisting that he own fifty-one percent of the outstanding shares.

■ Based upon the testimony and exhibits before it, the trial court, in a letter opinion, found that Hinkle went into this deal with the clearly-expressed intent that he would own 51% of the corporation and have control, and he was willing to lose the opportunity if he did not have that percentage and control. In addition, the trial court found that Taylor and Hufstedler decided to proceed with the business opportunity, perhaps believing that later they could get Hinkle to change his position, but this did not occur. As such, the trial judge determined that the appellants did not have a reasonable expectation of participation in management and control of the corporation. We hold that the trial court's findings were not clearly erroneous, and we affirm on this point.

### Amendment of Corporate Bylaws

At the January 22, 2003 meeting of shareholders and directors, the directors, *inter alia*, by a vote of Hinkle's 51 shares for and appellants 49 shares against voted to amend Article IV, Section 1, of the bylaws. As a result, the requirement that a director be a shareholder was deleted. Hinkle was then able to use his majority of votes to install his wife, Janet, in Hufstedler's place on the board of directors. Taylor and Hufstedler, meanwhile, pooled their votes in order to keep Taylor on the board. For their second point on appeal, Taylor and Hufstedler contend that the trial court erred in finding that Hinkle had the power to amend the corporation's bylaws. Again, we disagree.

Article 5 of the articles of incorporation provides:

> The power to amend or repeal the bylaws or to adopt a new code of bylaws shall be in the shareholders acting by a majority thereof **and also** in the board of directors acting by a two-thirds (2/3) vote of the directors.

(emphasis added). In their briefs to this court, Taylor and Hufstedler admit that this language could be interpreted as allowing Hinkle to amend the bylaws by a simple majority vote of shares, or, as requiring

a vote of a majority of the holders of the shares. However, they argue that if this language is read in conjunction with the other sections of the bylaws and articles of incorporation, then it is clear that the articles can only be amended by a 2/3 majority of the shareholders. Specifically, they contend that Article 13 of the bylaws, alone, controls the amending of the corporate bylaws. Article 13 provides:

> These bylaws may be altered or amended by a vote of the majority of the holders, in good standing, of the fully paid-up common stock at any annual or special meeting of the stockholders at which a quorum is present, but notice of the proposed change shall be given in the call of the meeting.

While it is true that, as a general rule, the specific provisions of a contract control the general provisions, *see Pate v. Goyne*, 212 Ark. 51, 204 S.W.2d 900 (1947), under the facts of this case, the appellants are mistaken.

In its order, the trial court cited Article 3, Section 5 of the bylaws, which states in pertinent part:

> Only holders of fully paid-up common stock in good standing shall have or exercise voting rights. Each share of common stock shall have one (1) vote.

In addition to Article 3, Section 5 of the bylaws, the trial court relied upon Ark. Code Ann. § 4-27-1020, which provides in part:

> A. A corporation's board of directors may amend or repeal the corporation's by-laws.

> B. A corporation's shareholders may amend or repeal the corporation's bylaws even though the bylaws may also be amended or repealed by its board of directors.

Based upon its reading of both the articles of incorporation and § 4-27-1020, the trial court correctly interpreted article five to allow amendment of the bylaws by either the stockholders or the directors. The question then becomes whether, when amending the bylaws, the board of directors vote per shareholder or per share. The trial court determined the latter. We agree.

Article 3, Section 5 of the bylaws goes on to say:

> A quorum shall be constituted when the person owning at least fifty-one percent (51%) of the outstanding and issued shares of stock, as indicated by the stock transfer register of the corporation, are in attendance. This quorum may transact the business of any meeting of the stockholders of this corporation, and a vote of the majority of such stockholders in attendance at such meeting shall be sufficient to pass or reject any properly proposed measure, except for the transaction of business which requires a different quorum or majority either by statute of this state or by the Articles of Incorporation of this corporation.

A quorum is defined by Article 3, Section 5 of the bylaws as the person owning at least 51% of the outstanding shares and issued shares of the stock. Appellants point to the apparent ambiguities between Article 3, Section 5, and Article 13 of the bylaws in asserting that any such ambiguities should be construed against the drafter, Hinkle, under the doctrine of *contra proferentem. Sturgis v. Skokos*, 335 Ark. 41, 977 S.W.2d 217 (1998). However, the *Sturgis* case went on to say that if there is an ambiguity, a court will accord considerable weight to the construction the parties themselves give to it, evidenced by subsequent statements, acts, and conduct. *Id.* It is well-settled that the polestar of contractual construction is to determine and enforce the intent of the parties. *Harris v. Stephens Production Co.*, 310 Ark. 67, 832 S.W.2d 837 (1992). This rule trumps all others, even the doctrine of *contra proferentem. Id.* In ascertaining this intention, the court should place itself in the same situation as the parties who made the contract in order to view the circumstances as the parties viewed them at the time the contract was made. *Asimos v. T.L. Rentals & Sons, Inc.*, 244 Ark. 1042, 429 S.W.2d 103 (1968); *Sternberg v. Snow King Baking Powder Co., Inc.*, 186 Ark. 1161, 57 S.W.2d 1057 (1933).

In the case at bar, the copious correspondence between the parties' attorneys indicates that the appellants certainly believed that Hinkle had the authority to unilaterally amend the bylaws. Skip Smith, Taylor and Hufstedler's lawyer, in his May 13, 1998 letter to Bob Donovan, Hinkle's lawyer, stated, in pertinent part:

> The bylaws already provide that only shareholders may be directors of the corporation. Currently, however, with his majority control, Michael Hinkle could conceivably amend the bylaws to delete this provision, then use his ownership to elect an outside director.

After he acquiesced and allowed Hinkle to assume 51% ownership and control of the corporation, Taylor became angry and refused to

help capitalize the corporation, despite an earlier agreement to do so. Furthermore, the long history of discord between the parties indicates that neither Taylor nor Hufstedler truly believed that it would take a 2/3 per capita vote to remove a board member, or carry out other major corporate actions. Accordingly, the appellants could not have reasonably believed their seats on the board of directors were protected by a requirement of per capita voting on amendments to the bylaws.

We have held that documents are to be construed in a manner which gives reasonable and sensible effect to all clauses of the contract, within the entire context of the agreement. *Sturgis, supra.* Based upon the four corners of the corporate contract and parties' subsequent conduct regarding said contract, we cannot say that the trial court erred in finding that Hinkle's actions at the January 23, 2003 shareholders meeting were authorized by the articles of incorporation. In fact, if one were to follow Taylor and Hufstedler's argument to its logical conclusion, a person holding 98% of the shares in a close corporation could be subjugated to the will of other shareholders who collectively hold two percent, resulting in an absurd result. Accordingly, we affirm the trial court on this point as well.

### Removal from the Board of Directors

Finally, appellants argue that the trial court erred in finding that Taylor and Hufstedler grossly abused their discretion, thus necessitating their removal from BEIIFE's board of directors pursuant to Ark. Code Ann. § 4-27-809 (Repl. 2001). We hold otherwise.

At the 2000 board of directors/shareholders meeting, Taylor and Hufstedler voted to remove Hinkle as president of BEIIFE, and installed Taylor in his place. In addition, they passed a measure requiring the corporation to open a savings account with a Jonesboro bank, and another measure authorizing the issuance of additional corporate stock, which could not be transferred to a non-shareholder. They also passed a measure allowing shareholders to purchase these shares up to their pro-rata ownership percentages, but the shares could only by purchased with cash, not with debt owed by the corporation. Finally, they intended to move the corporation's checkbook to Jonesboro, and they wanted to have the mail sent there as well, but Hinkle adjourned the meeting before these two measures could be voted upon.

Ark. Code Ann. § 4-27-809 provides, in pertinent part:

(a)  The circuit court of the county where a corporation's principal office (or, if none in this state, its registered office) is located may remove a director of the corporation from office in a proceeding commenced either by the corporation or by its shareholder holding at least ten percent (10%) of the outstanding shares of any class if the court finds that (1) the director engaged in fraudulent or dishonest conduct, or gross abuse of authority or discretion, with respect to the corporation and (2) removal is in the best interest of the corporation.

The issue is whether Taylor's and Hufstedler's actions constituted a gross abuse of discretion. It is well established that the first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in the common language. When a statute is clear, we will not search for legislative intent; rather, that intent must be gathered from the plain meaning of the language used. *Cave City Nursing Home, Inc. v. Arkansas Department of Human Services*, 351 Ark. 13, 89 S.W.3d 884 (2002).

Taylor and Hufstedler argue that all of their actions at the January 2000 board/shareholders meeting were authorized by corporate documents. The stock purchase agreement, item 19 on Taylor's checklist for the January 2000 meeting, provided:

Motion that each shareholder buy Five (5) or up to their pro rata basis (as included in Article Tenth of the Articles of Incorporation of the corporation) of shares of common stock of BEIIFE, Inc.  These shares can be purchased for cash and not for any moneys owed to the shareholder by BEIIFE, Inc.  Also, all moneys from this stock sale must be placed in the above savings account at Mid-South Bank in Jonesboro, AR.  This offer expires in thirty (30) days from today.

In support of his argument that this move was authorized, Taylor points to Article 4 of the articles of incorporation, which authorizes the corporation to issue 1,000 shares of stock. At the time the measure had passed, the corporation had only issued 100 shares of stock. Article 5 of the articles of incorporation allows the corporation to select a depository bank, and the appellants argue that they were within their rights to pick a bank in Jonesboro, rather than one close to the franchise. Next, the appellants point to

Article 10 of the articles of incorporation, giving each shareholder a first right to purchase shares up to their pro rata percentage of ownership, a right which expires after thirty days.

Hinkle counters by saying that these measures violate the franchise agreement, which cannot be changed without Honda's prior written approval. The franchise agreement provides, in pertinent part:

## B.

Dealer covenants and agrees that this agreement is personal to dealer, to the dealer owner, and to the dealer manager, and American Honda has entered into this agreement based on their particular qualifications and attributes and a continued ownership or participation dealership operations. The parties agree that the ability of the dealer to perform this agreement itself are both conditioned upon the continued active involvement in the ownership of dealer by the following person(s) in the percentage(s) shown:

| Name | Title | Percentage of Ownership |
| --- | --- | --- |
| Michael Hinkle | President | 51% |
| Steven Hufstedler | Shareholder | 25% |
| Alan Taylor | Shareholder | 24% |

## C.

Dealer represents and American Honda enters into this agreement in reliance on the representation that Michael Hinkle exercises the functions of dealer manager and is in complete charge of the dealership operations with authority to make all decisions on behalf of the dealer with respect to dealership operations. Dealer agrees that there will be no change in dealership manager without prior written approval of American Honda. Such approval shall not be unreasonably withheld.

First, Hinkle asserts that the stock purchase measure would have forced him to have to purchase his pro rata percentage of stock or else he would no longer have maintained his 51% ownership interest. As stated above, per the franchise agreement, Hinkle is to remain 51% owner unless Honda gives prior approval to a change in the ownership percentages. In the case at bar, Honda gave no such prior approval.

Next, Hinkle points to the intended use of the money from the stock purchase agreement to highlight the alleged misconduct. Items 13 through 21 of the Taylor checklist at the board meeting say: that the stock will be sold; that a used inventory, floor planning and retail financing loan will be secured from Mid-South Bank; and that the stock sale proceeds will be placed in that bank. Taylor's testimony at trial showed that the sale proceeds would be used to establish a deposit relationship with Mid-South Bank. The corporation would then borrow $100,000 from the bank. The loan proceeds would then be put back into the business, and then distributed out to the shareholders in order to give Taylor and Hufstedler some cash out of the corporation. Hinkle contends Taylor's and Hufstedler's purpose in voting for the measure was to generate some cash for themselves, i.e. to benefit their own self-interest, rather than the corporation's best interest.

The trial court found that directors of any corporation owe to the corporation certain duties. First, a director owes the duty to act within the bounds of his authority. Second, a director must exercise a standard of care which an ordinary prudent director of a similar corporation would exercise under similar circumstances. Finally, a director may not pursue his own interests in a manner which is injurious to the corporation.

While the trial court's finding that the appellants had moved the mail and the checkbook from Forrest City to Jonesboro was in error, the appellants cannot show that they were prejudiced by that finding. We will not reverse absent a showing of prejudice. *Peters v. Pierce,* 314 Ark. 8, 858 S.W.2d 680 (1993). At trial, although he conceded that he could not own the Forrest City dealership, Taylor admitted that if he could wrest control from Hinkle, that would be a good thing for him. He also testified that he intended to take away all record-keeping or accounting-type functions, such as sales, expenses, profits, and that kind of thing, from Hinkle to his dealership in Jonesboro. Taylor admitted that he intended to take the checkbook to Jonesboro, and that he intended to shut down the mail and have it sent to Jonesboro as well. Taylor said that he did not think a person needed a checkbook to run a six or seven million dollar business. The appellants claim that their subjective desire to do several other things that would obviously hurt the corporation, such as moving the books, mail, and checkbook two counties away and keeping it from the person who was supposed to be running the corporation and the

day-to-day operations, does not rise to the level of a gross abuse of discretion. We disagree. The appellants' intent to do those acts, coupled with the actions that appellants did, in fact, carry out, more than constitute a gross abuse of discretion.

In its letter opinion, dated August 4, 2003, the trial court expressly ruled that:

> Here, the Defendant, Taylor was quite candid in admitting that his actions were taken as a result of Plaintiff Hinkle's insistence of having 51% of the corporation. The actions of the Defendants, described above, were retaliatory in nature. After acquisition of the Honda agreement the Defendants then became obstructive instead of supportive of the corporation. The court finds that these directors' actions were contrary to the best interest of the corporation and that the path the Defendants decided to take jeopardized the corporation.
>
> The court finds that the actions of these Defendants do constitute a gross abuse of their discretion and authority. Pursuant to A.C.A. 4-27-807 these Defendants are removed from the Board of Directors for a period of two (2) years.

Taylor and Hufstedler's blatant violations of the franchise agreement, coupled with their clear intentions to commit other actions designed to wrest control away from Hinkle, are clearly injurious to the corporation, and such actions do, indeed, constitute a gross abuse of discretion. Based on the evidence presented in this particular case, we cannot say that the trial court abused its discretion in removing the appellants from the board of directors.

Affirmed.

THORNTON, J., not participating.