GLENN MECHANICAL, INC. *v.*
SOUTH ARKANSAS REGIONAL HEALTH CENTER, INC.,
and Southeast Building Concepts, Inc.

CA 06-1473                                              278 S.W.3d 583

Court of Appeals of Arkansas
Opinion delivered March 5, 2008

*Compton, Prewett, Thomas & Hickey, LLP*, by: *F. Mattison Thomas, III*, for appellant.

*Smith Akins, P.A.*, by: *James E. Smith, Jr.*, for appellee.

D.P. MARSHALL JR., Judge. Dirt work led to a dispute that became this case. Southeast Building Concepts was the general contractor for building South Arkansas Regional Health Center a new hospital in El Dorado. Glenn Mechanical was the second subcontractor to take on the dirt work. The circuit court held that the Southeast/Glenn contract, which Glenn drafted, governed the disputed work of undercutting for the hospital parking lot. Based on the existence of that contract, Judge Guthrie also rejected Glenn's quasi-contract theories of recovery. Glenn's appeal brings the case here.

## I.

We affirm the circuit court's decision that Southeast and Glenn made a contract that covered the disputed dirt work. Glenn bid on two subcontracts for this project: the heating, ventilation, and air conditioning work and the dirt work. It got the HVAC contract, and in due course completed all this mechanical work without any snags. Glenn did not get the dirt work subcontract initially. But when the company who did filed for bankruptcy after starting the job, Southeast asked Glenn to bid to finish it. Glenn did so. Southeast accepted the bid, which was $62,000.00 for specified tasks and a per-load price for undercutting — hauling dirt out of and into — the parking lot site. The specific number of loads was to be determined by written change order. The parties

reduced their agreement to a contract, which Glenn wanted to write and did write. The contract was signed the day that Glenn began work. Because the dirt work needed to be done immediately, Southeast wanted Glenn on site as soon as possible, and their contract provided that time was of the essence.

The parties' dispute turns on Article 4 of their contract. This provision is entitled "CHANGES IN THE WORK." It states:

I.  The Contractor and Subcontractor agree that the Contractor may add to or deduct from the amount of work covered by this Agreement, and any changes so made in the amount of Work involved, or any other parts of this agreement, shall be by a written amendment hereto setting forth in detail the changes involved and the value thereof which shall be mutually agreed upon between the Contractor and Subcontractor. The Subcontractor agrees to proceed with the Work as changed when so ordered in writing by the Contractor so as not to delay the progress of the Work, and pending any determination of the value thereof unless Contractor first requests a proposal of cost before the change is effected. If the Contractor requests a proposal of costs for a change, the Subcontractor shall promptly comply with such request. Change Order Items Specifically include:

> i. Demo of Wet Sandy Soil and Haul Offper cubic yard  $6.50
>
> ii. Haul in, Spread and Compact Select Fill per cubic yard  $11.50
>
> iii. Haul in, Spread and Compact "B" Stone per cubic yard  $32.00
>
> iv. Haul In, Spread and Compact SB-2 Stone per cubic yard  $32.00
>
> v. Lay Geo Textile Fabric (eq. Mirafi 140N) per 12' x 360' roll  $825.00

II.  The Subcontractor will make all claims for extra compensation and for extension of time to the Contractor promptly in accordance with this Article and consistent with the Contract Documents.

III. Not withstanding any other provision, if the Work for which the Subcontractor claims extra compensation is determined by

the Owner not to entitle the Contractor to a Change Order or extra compensation, then the Contractor shall not be liable for any extra compensation for such Work, unless Contractor agreed in writing to such extra compensation.

The original subcontractor had left a big hole containing wet, sandy soil and standing water. At the request of Southeast's job superintendent, Glenn therefore began undercutting the parking lot. Glenn's witnesses testified at trial that the superintendent told them that a change order was in the works for the many loads of dirt that Glenn began hauling out and hauling in. Glenn worked for about a week and faxed an interim bill to Southeast for approximately $27,000.00 for undercutting. Meanwhile, Glenn requested and Southeast approved two change orders about unrelated dirt work on a driveway and a French drain. These change orders increased the fixed-price part of the contract to approximately $94,000.00.

Southeast did not respond immediately to Glenn's interim bill for the undercutting. Glenn continued to haul dirt out and in, preparing the ground for the parking lot. After another week of work, Southeast rejected the first bill, and Glenn submitted a bill for its second week of undercutting. The total for all of Glenn's undercutting work was approximately $64,000.00. Because Southeast refused to pay the bills, the dirt work stopped. Southeast and Glenn were unable to resolve their dispute; Glenn left the job; and Southeast contracted with a third company to finish the dirt work. Southeast also paid approximately $38,000.00 to a dozer company with whom Glenn had contracted to help on the undercutting.

The hub of the case is whether Glenn and Southeast had a contract about the undercutting. The circuit court's conclusion that they did is not clearly against the preponderance of the evidence. *Taylor v. Hinkle*, 360 Ark. 121, 129, 200 S.W.3d 387, 392 (2004). Glenn contends otherwise, arguing that the contract is indefinite about the undercutting and that the parties' conflicting testimony about whether the $62,000.00 base price covered the undercutting shows that no mutual agreement existed. *E.g., Williamson v. Sanofi Winthrop Pharm., Inc.*, 347 Ark. 89, 98, 60 S.W.3d 428, 433-34 (2001) (contractual elements).

Glenn's contract is definite enough and reflects mutual agreement. Southeast agreed to Glenn's proposal about how to decide the amount of undercutting to be done at Glenn's per-load

price. The nature of this work necessarily contained some uncertainty. Exactly how much unstable soil needed to be removed and replaced with more solid material to provide an adequate base for the parking lot was a matter of judgment. Glenn's project engineer testified that all of Glenn's work was necessary to stabilize the ground. Other witnesses, however, testified that less undercutting would have been sufficient for this parking lot, which would not carry heavy loads. And one Southeast witness testified that he did not think that, if it had been given the choice, the Health Center would have agreed to pay for all the undercutting that Glenn eventually did.

The parties dealt with the uncertainty by subjecting the undercutting work to the change-order provision of their agreement with fixed load-in/load-out prices. Southeast was not on the hook for the undercutting until it approved the work in writing. Their contract stated that any changes from the base price "shall be by a written amendment hereto setting forth in detail the changes involved and the value thereof which shall be mutually agreed upon between [Southeast] and [Glenn]." This is a definite agreement about how the parties would decide exactly how much undercutting to do. No such writing about this work was ever executed.

This contract — which Glenn drafted — put Southeast in control: the general contractor had to approve the amount of undercutting in writing; if it did, then the parties' contract gave Glenn the right to insist on payment from Southeast even if the Health Center ultimately refused to pay Southeast. Whether this allocation of authority and risk was wise is not the issue. This is the contract that Glenn proposed and Southeast accepted. They followed it when changing other tasks and substantially increasing the price of the other dirt work. And their contract governs their dispute about the undercutting.

■ Testimony from one of Southeast's principals and its superintendent that they thought the base contract price covered all the undercutting was evidence of confusion or a unilateral mistake, but it is not a sufficient reason to hold that the parties' express contract failed for lack of mutual agreement. *Frazier v. State Bank of Decatur*, 101 Ark. 135, 140-41, 141 S.W. 941, 943-44 (1911). As the circuit court found, Glenn knew that it needed Southeast's written approval of the amount of undercutting. It expected that approval. But under the parties' contract, Glenn must bear the consequences of not getting it.

## II.

We also reject Glenn's argument for a quasi-contractual recovery based on promissory estoppel or unjust enrichment. The basis of this argument is testimony that Southeast's superintendent urged Glenn to do all the undercutting immediately and promised a change order. At trial, the superintendent denied this promise and his credibility was for the circuit court sitting as the fact-finder. *Taylor*, 360 Ark. at 129, 200 S.W.3d at 392. On the other side of the evidentiary scale, Glenn's witnesses were experienced subcontractors who acknowledged that change orders are commonplace and that a company does extra work without one at its own risk. In any event, these disputed facts do not answer the contract question.

As the circuit court held, the parties had an enforceable written contract about the undercutting, and that contract prevents recovery on a quantum meruit basis. With exceptions not applicable here, "the law never accommodates a party with an implied contract when he has made a specific one on the same subject matter." *Lowell Perkins Agency, Inc. v. Jacobs*, 250 Ark. 952, 959, 469 S.W.2d 89, 92-93 (1971). Glenn's quasi-contract theories therefore fail as a matter of law. *Taylor v. George*, 92 Ark. App. 264, 274, 212 S.W.3d 17, 24-25 (2005) (promissory estoppel); *Coleman's Service Center, Inc. v. FDIC*, 55 Ark. App. 275, 299, 935 S.W.2d 289, 302 (1996) (unjust enrichment).

The record supports the circuit court's finding that both parties prevailed in some degree and presented cases of merit in good faith. Southeast's refusal to come to final terms with Glenn about the amount of undercutting, the court held, was unreasonable and discharged Glenn from further performance. This breach barred Southeast from recovering the approximately $75,000.00 that it had to pay the third subcontractor to finish the dirt work. Southeast has not cross-appealed this ruling. The circuit court likewise noted that, although Southeast paid Glenn's dozer subcontractor approximately $38,000.00, thereby relieving Glenn of this obligation, Southeast did not try to recover this expense from Glenn. Finally, the court declined to award attorney's fees and costs to either party. In sum, Glenn's assignments of error present no basis for reversing the circuit court's careful resolution of all the issues.

Affirmed.

HART and BIRD, JJ., agree.