

# ARKANSAS COURT OF APPEALS
## DIVISION II
No.   CV-15-731

| | |
|---|---|
| GENE GARNER AND LINDA NARUG | **Opinion Delivered**:  October 18, 2017 |
| APPELLANTS | APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO. 26CV-14-746] |
| V. | |
| BOARD OF DIRECTORS, HOT SPRINGS VILLAGE PROPERTY OWNERS ASSOCIATION, AND HOT SPRINGS VILLAGE PROPERTY OWNERS ASSOCIATION | HONORABLE LYNN WILLIAMS, JUDGE |
| APPELLEES | AFFIRMED |

## MIKE MURPHY, Judge

This is an appeal arising out of a declaratory-judgment action.  Appellants Gene Garner and Lynda Narug sued appellees Hot Springs Village Property Owners' Association (HSVPOA) and its board of directors regarding measures taken by those entities that affected appellants as residents and members of the property owners' association.  Following a bench trial, the circuit court dismissed appellants' complaint with prejudice.  Appellants raise four arguments in support of reversal—namely, whether the circuit court erred in finding that (1) the two-tier assessment system was reasonable, (2) the board had the authority to amend the protective covenants and that the amendment allowing for the creation of overlay zones was reasonable, (3) the board could vote its nonpaying inventory lots to establish a quorum, and (4) moneys raised from the annual assessment could be used to fund the master plan and other development. Finding no error, we affirm.

I. *Background and Issues on Appeal*

Hot Springs Village is a residential and commercial community located in Saline and Garland Counties. It is the largest gated community in the United States. Appellants are residents of Hot Springs Village and members in good standing of HSVPOA. HSVPOA is a nonprofit corporation that serves as the administrator of Hot Springs Village. HSVPOA owns the common property as well as many amenities and is governed by a board of directors. HSVPOA and its board of directors were formed in 1970 in conjunction with Cooper Communities, Inc., and are governed by a declaration, bylaws, and protective covenants.

There are 34,418 lots in Hot Springs Village. Of these lots, 8,476 are improved, and 25,083 are unimproved—lots are differentiated as improved and unimproved based on the presence or absence of a water meter. There are an additional 2,354 inventory lots—these lots are controlled by HSVPOA and are not subject to the payment of dues. Each member of HSVPOA has voting rights and gets one vote per lot regardless of whether the lot is improved. For many years, all lot owners paid assessments of $36.68 per lot.

At the inception of Hot Springs Village in 1970, lot sales and profits were steady. From 2003 to 2008, National Recreational Properties, Inc. (NRPI) accumulated many lots and began to pay assessments on these lots and to resell them. After the recession, NRPI stopped paying assessments on the lots it owned in 2008. NRPI abandoned its lots, and other property owners abandoned and turned over their lots to HSVPOA as well. This negatively affected the financial soundness of HSVPOA.

SLIP OPINION

In 2013, HSVPOA experienced a $3.2 million budget shortfall, and the HSVPOA board president appointed a group known as the Future Financial Task Force (FFTF) to research potential revenue options to maintain HSVPOA's financial viability. From October 2013 to July 2014, the FFTF evaluated new funding options and ultimately recommended the adoption of a two-tier assessment. The two-tier assessment would require owners of improved lots to pay $65 a month to HSVPOA while owners of unimproved lots would continue to pay $36.68 a month.

The board considered the FFTF's recommendation and eventually decided to send this initiative to a vote of the members of HSVPOA. The vote was to take place in November 2014.

Before the vote, appellants and Cathy Rudder[1] filed a lawsuit against appellees in the Garland County Circuit Court seeking an injunction against the November 2014 election and declaratory relief that the proposed two-tier assessment was unreasonable. Appellants and Rudder also moved for a preliminary injunction.

The November 2014 vote occurred, but a quorum was not established, and the vote was of no effect. Thereafter, the board voted to resubmit the issue to HSVPOA members for a vote in February 2015.

Following the November 2014 vote, appellants amended their complaint multiple times, including to drop Rudder as a plaintiff and to account for the November 2014 and upcoming February 2015 votes. The circuit court also held a hearing on the motion for

---

[1]Appellants' complaint was later amended to remove Rudder as a plaintiff.

preliminary injunction in January 2015.  The circuit court denied the request for a preliminary injunction, and appellants did not appeal from the denial.

In the February 2015 election, a full quorum was achieved, and the voters approved the two-tier assessment.

Subsequently, appellants amended their complaint a fourth and final time.  In their fourth amended complaint, they sought a declaration that certain amendments to the protective covenants were void. Specifically, they challenged the board's authority to amend protective covenants to create overlay zones.  In May 2014, the board had amended the protective covenants to create overlay zones—areas where the zoning restrictions could be modified.  The board took this action to attempt to create development in Hot Springs Village.

The circuit court held a bench trial on the matter in June 2015.  The primary focus of the litigation was whether the establishment of the two-tier assessment system in which owners of improved lots paid higher assessments than those with unimproved lots was reasonable. In July 2015, the circuit court entered a thorough judgment with extensive findings of fact and conclusions of law dismissing appellants' complaint with prejudice.

Appellants timely appealed, raising four arguments in support of reversal.  First, they argue that the circuit court erred in ruling that the two-tier assessment system was reasonable.  Next, appellants challenge the circuit court's finding that the board had the authority to amend the protective covenants and that the amendment allowing for the creation of overlay zones was reasonable.  Appellants also challenge the circuit court's finding that the board could vote its nonpaying inventory lots to establish a quorum.  Finally,

 

appellants contend that the circuit court erred in finding that moneys raised from the annual

assessment could be used to fund the master plan and other development.

## II. *The Two-Tier Assessment*

Appellants contend that the circuit court erred when it found that appellees'

establishment of a two-tier assessment system in which owners of improved lots paid higher

assessments than owners of unimproved lots was reasonable.  This issue was the primary

focus of the litigation.

Property owners may seek judicial intervention for recourse against any arbitrary and

capricious acts by a board of directors.  *Kell v. Bella Vista Prop. Owners' Ass'n*, 258 Ark. 757,

763, 528 S.W.2d 651, 655 (1975). In *Hutchens v. Bella Vista Property Owners' Association*, this

court adopted a reasonableness test to determine whether an action by a property owners'

association that negatively affects some of its members is permissible.  82 Ark. App. 28, 37,

110 S.W.3d 325, 330 (2003).   Under the reasonableness test, a rule that is unreasonable,

arbitrary, or capricious is invalid.   *Id.* at 36, 110 S.W.3d at 330.   "In applying the

reasonableness test, the reviewing court must determine:

> (1) whether the decision or rule is arbitrary,
>
> (2) whether the decision or rule is applied in an even-handed or discriminatory manner, and
>
> (3) whether the decision or rule was made in good faith for the common welfare of the owners and occupants of the condominium.

*Id.*    Courts will especially consider whether the majority's action has an unfair or

disproportionate impact on only certain unit owners.  *Id.*

SLIP OPINION

In evaluating whether the circuit court erred in finding that the two-tier assessment was reasonable, our review is limited to whether the decision was clearly erroneous. *Poff v. Peedin*, 2010 Ark. 136, 366 S.W.3d 347. In its judgment, the circuit court went into extensive detail to make clear the findings it made on the evidence before it. The circuit court found that the two-tier assessment was "a principled distinction arrived at after a rational, deliberative process."

First, we consider the evidence regarding whether the implementation of a two-tier assessment was arbitrary. *Hutchens*, 82 Ark. App. at 36, 110 S.W.3d at 330. Appellants admit that the two-tier assessment scheme was marketed to appear reasonable, but they claim that the marketing was merely a pretext. Appellants argue that board members knew that owners of unimproved lots would not vote to increase their own assessments and saw the two-tier assessment scheme as the only way to increase HSVPOA funds. Appellants maintain that owners of unimproved lots have no incentive to stop increasing the assessments for owners of improved lots.

In contrast, appellees accentuate facts in evidence that they contend support the conclusion that the two-tier assessment was not arbitrary. Specifically, they highlight evidence regarding the significant decline in assessment revenue and the negative impact it had on Hot Springs Village. Appellees also emphasize the lengths to which the board went to investigate options to address the decline in revenue. The board appointed the FFTF to study the situation. The board then evaluated the FFTF's proposal, voted, and took feedback and public comment before submitting the proposal to the property owners. Under these facts, the decision to implement the two-tier assessment was not arbitrary.

Next, we consider "whether the decision or rule is applied in an even-handed or discriminatory manner." *Id.* Appellants argue that the implementation of a two-tier assessment created a situation in which the majority controlled and required the minority to pay assessments that nearly doubled while the majority's assessments remained unchanged. They contend that the creation of two tiers offers no incentive for the majority owners to increase their own assessments. Appellants also emphasize evidence that they believe shows that the increase was proposed only to address the community's budget shortfall. They argue that this evidence demonstrates the inequitable nature of the two-tier assessment because testimony from former board president Frank Leeming indicated that the budget shortfall originated out of the failure of owners of unimproved lots to pay their assessments.

Additionally, appellants discuss that many owners of unimproved lots—3,477—live within 100 miles of Hot Springs Village and have quick access to Hot Springs Village and its amenities. Appellants also mention the testimony of current board president Harvey Shelton that it was the board's desire that both tiers pay the same assessment by 2020. They argue that Shelton's statement is an admission of the inherent unfairness of the two-tier assessment.

Appellees acknowledge that the two-tier assessment creates a distinction between owners of improved lots and owners of unimproved lots. However, they contend that this distinction is not, by definition, discriminatory. To be discriminatory, the distinction must be unprincipled and irrational, and they assert that in this case, the creation of the two tiers was fair and rational because the two-tier assessment reflects the more significant usage of amenities by owners of improved lots. Evidence was introduced to demonstrate that owners

of improved lots used property-owner-association facilities, such as services and infrastructure, more often than owners of unimproved lots. Accordingly, we conclude that the evidence supported the finding that the two-tier assessment was even-handed and not discriminatory.

Finally, we evaluate "whether the decision or rule was made in good faith for the common welfare of the owners and occupants of the condominium." *Id.* Here, the circuit court made a finding that the board "acted in good faith and in what it considered the best interests of the POA and Hot Springs Village." Appellants again highlight evidence that board members thought the only way to overcome HSVPOA's budget issues was to increase assessments on owners of improved lots.

In response, appellees emphasize testimony that supports the circuit court's finding. Specifically, they discuss the testimony regarding the research and measures that occurred before the owners voted on the two-tier assessment as well as the perceived need for the assessment. In addition, they point to the testimony of Leeming who opposed the two-tier assessment but testified that "the board majority truly felt that the two-tier assessment would go a long way towards resolving the POA's financial needs." We see no error in the circuit court's finding that the decision was made in good faith.

In evaluating the evidence that was before the circuit court, we hold that the circuit court did not clearly err when it found that the two-tier assessment was reasonable. The circuit court's thorough order includes detailed findings on the reasonableness of the two-tier assessment. Evidence demonstrates the need for additional funds. Additionally, there is evidence that the decision to implement a two-tier assessment was arrived at after

extensive study and that the decision was rationally based on the fact that owners of improved lots used association amenities more often than owners of unimproved lots.

Appellants raise an additional challenge to the reasonableness of the two-tier assessment. Appellants contend that the two-tier assessment was unreasonable because HSVPOA's governing documents did not allow such an assessment.

In particular, appellants argue that article X, § 3 of the declaration prohibited an unequal assessment. This section provides that the board, by a two-thirds majority vote, can increase the annual assessment, but no greater than the Consumer Price Index. However, article X, § 5 of the declaration provides that a majority of a quorum of HSVPOA members in good standing can vote to increase the amount of the annual assessment with no limit on the amount. A plain reading of the declaration shows that article X, § 3 only governs the board's authority to increase annual assessments—it does not affect HSVPOA membership's authority to fix annual assessments through a vote of the membership.

III. *The Modification of Protective Covenants and the Creation of Overlay Zones*

In appellants' next point on appeal, they argue that the circuit court erred by finding that the board had the authority to modify protective covenants and create overlay zones.

Appellants first argue that appellees did not have the authority to modify the protective covenants. We disagree. Since Hot Springs Village's inception in 1970, Cooper Communities and its successors and assigns had the authority to amend, rescind, and add to protective covenants. Article XIV, § 4 of the declaration gave Cooper Communities the authority to assign its rights, and it assigned its developer rights to HSVPOA in April 2011.

Accordingly, the April 2011 agreement gave appellees the authority to amend, rescind, and add to the protective covenants.

Appellants next argue that the governing documents prevented the manner in which appellees amended the protective covenants. Appellants contend that because the protective covenants are incorporated into the declaration, the protective covenants can be amended only in the manner described in the declaration.

Article XIV, § 1 of the declaration provides that the passage of any amendment requires a two-thirds vote of the owners in good standing. Appellants accurately represent the language of article XIV, § 1 of the declaration. However, they fail to take into consideration the language of the protective covenants. Paragraph 3 of the protective covenants contemplates that the protective covenants may be amended by the board.

The declaration and the protective covenants are distinct documents that should be interpreted as such. The declaration provides the overarching structure of HSVPOA, and the protective covenants govern daily life in the community. Paragraph 3 of the protective covenants allows the board to amend the protective covenants, and that provision is meaningless and in contravention of Arkansas law if article XIV, § 1 of the declaration controls.

Assuming arguendo that the protective covenants and the declaration are a unified document, the board still had the authority to amend the protective covenants. "Specific provisions of a contract control the general provisions." *Taylor v. Hinkle*, 360 Ark. 121, 133, 200 S.W.3d 387, 395 (2004). The protective covenants provide a specific procedure for their amendment. This procedure controls over the general provision of article XIV, §

SLIP OPINION

1 that requires a two-thirds vote of the owners in good standing for the passage of an amendment.

Finally, appellants argue that the creation of overlay zones was unreasonable because Arkansas Code Annotated section 18-12-103 requires a 100 percent vote of the owners for passage. We do not reach the merits of this argument because the circuit court did not consider it or rule on it. Our court has held that it will not review a matter on which the circuit court has not ruled, and a ruling should not be presumed. *Reed v. Guard*, 374 Ark. 1, 5, 285 S.W.3d 662, 665 (2008).

IV. *The Use of Inventory Lots to Obtain a Quorum*

The question presented in appellants' third point on appeal is whether the declaration and bylaws allowed inventory lots—lots owned by HSVPOA and not subject to the payment of dues—to be used to increase the number of votes in an election for the purpose of obtaining a quorum. The circuit court's judgment includes the following finding: "The Bylaws, Article IV, § 1, state that votes from lots owned by the POA will be cast in the same proportion as votes cast by all members in good standing in all elections under the Declaration." Appellants contend that this finding amounted to reversible error.

We summarily dispose of this issue for two reasons. First, the circuit court's finding was a verbatim recitation of a stipulation entered into by the parties. The parties agreed that the bylaws allowed inventory lots to be used to increase the number of votes in an election for the purpose of obtaining a quorum, and it is a basic rule of appellate procedure that a party cannot change arguments on appeal. *Taylor v. Producers Rice Mill, Inc.*, 89 Ark. App. 327, 202 S.W.3d 565 (2005). Furthermore, the parties stipulated that "POA-owned lots

were not used" in the February 2015 vote. Because inventory lots were not used to obtain a quorum in this instance, the issue is not proper for our consideration. As a general rule, appellate courts will not review issues that are moot. *Warren Wholesale Co., Inc. v. McLane Co., Inc.*, 374 Ark. 171, 174, 286 S.W.3d 709, 711 (2008). A case becomes moot when any judgment rendered would have no practical legal effect upon a then existing legal controversy. *Id.* To do so would be to render advisory opinions, which this court will not do. *Id.*

## V. *The Use of the Assessment Funds*

In their final point on appeal, appellants challenge the circuit court's finding that the annual assessment funds will be used for permissible purposes. The circuit court's judgment provides that "the increased assessment revenue will also replenish the POA's cash reserves" and finds that all proposed uses "directly or indirectly promote the health, safety, and welfare of lot owners."

According to the declaration, a special assessment is an assessment that is limited in time and imposed specifically for the purpose of defraying, in whole or in part, the cost of construction or reconstruction, unexpected repair or replacement of sewer systems, water systems, ways of access for vehicles and roads and streets. By contrast, the declaration provides that annual assessments are to be levied for the purpose of "promoting the recreation, health, safety and welfare of the owners, . . . in particular, the construction, improvement, and maintenance of the properties, service and facilities devoted to this purpose and related to the use and enjoyment of the . . . properties."

SLIP OPINION

The circuit court heard evidence that the revenue generated by the two-tier assessment would be used for municipal services like paving roads, maintaining buildings, keeping the water and sewer systems working, collecting trash, and mowing grass as well as for subsidizing HSVPOA amenities. The increase was also intended to replenish HSVPOA's cash reserves. The evidence supports the circuit court's finding that the assessment funds would be used for maintenance and to promote the health, safety, and welfare of owners. Accordingly, we hold that the circuit court did not err in determining that the proposed use of the funds generated by the two-tier assessment fell within the definition of an annual assessment.

VI. *Conclusion*

After considering each of appellants' arguments on appeal, we affirm the decision of the circuit court in all respects.

Affirmed.

VIRDEN and GLOVER, JJ., agree.

*Legacy Law Group*, by: *Bryan J. Reis* and *Philip B. Montgomery*, for appellants.

*Quattlebaum, Grooms & Tull PLLC*, by: *E.B. Chiles IV* and *Justice J. Brooks I*, for appellees.