# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-3115
_____

James Buchl; Doren Chatinover

*Plaintiffs - Appellees*

v.

Gascoyne Materials Handling & Recycling, L.L.C.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of North Dakota - Western

_____

Submitted: October 19, 2023
Filed: April 30, 2024

_____

Before SMITH, Chief Judge,[1] LOKEN and COLLOTON,[2] Circuit Judges.

_____

LOKEN, Circuit Judge.

_____

[1]Judge Smith completed his term as chief judge of the circuit on March 10, 2024. *See* 28 U.S.C. § 45(a)(3)(A).

[2]Judge Colloton became chief judge of the circuit on March 11, 2024. *See* 28 U.S.C. § 45(a)(1).

In 2011, Jay Buchl and Doren Chatinover ("Plaintiffs"), electrical engineers with experience working in oil fields, entered into an oral at-will contract with Gascoyne Materials Handling & Recycling ("Gascoyne") to work as project managers for a division of Gascoyne known as GMHR Field Services, performing electrical contracting design and installation in the Bakken oil field of North Dakota. After five profitable years, Gascoyne stopped making monthly payments under the contract in January 2017. Plaintiffs ended the relationship in February and filed this diversity action on March 9, 2017.

Plaintiffs' initial Complaint alleged eleven causes of action. Gascoyne moved to dismiss and asserted counterclaims. The district court dismissed Plaintiffs' claims for fraud/deceit. In response to the parties' subsequent cross-motions for summary judgment, the district court granted Plaintiffs a declaratory judgment that they are entitled to 50 percent of GMHR Field Services' net profits during their term of employment at Gascoyne; dismissed all partnership-related claims; and dismissed Plaintiffs' claims for breach of fiduciary duty arising out of a joint venture, for a receiver, and for unjust enrichment. The case proceeded to a bench trial on Plaintiffs' remaining claims for breach of contract and conversion and on Gascoyne's counterclaims for breach of contract, fraud/deceit, conversion, unjust enrichment, and breach of fiduciary duty.

At an eight-day trial in September 2021, eleven witnesses testified and more than 5,000 pages of exhibits were submitted. The parties submitted post-trial briefs and Proposed Findings of Fact. On April 26, 2022, the district court issued its 103-page Findings of Fact and Conclusions of Law, including 306 findings of fact and 42 conclusions of law. Buchl v. Gascoyne Materials Handling Recycling, L.L.C., No. 1:17-cv-00048, 2022 WL 7739567 (D.N.D. Apr. 26, 2022). The court found that Gascoyne had underpaid Plaintiffs by $822,199 and entered judgment in Plaintiffs' favor in that amount, plus prejudgment and post-judgment interest. The court dismissed Gascoyne's counterclaims.

On May 24, 2022, Gascoyne filed a post-trial motion to alter or amend, raising the issues now presented on appeal. Plaintiffs opposed the motion, arguing Gascoyne's arguments "have previously been addressed, are without merit, and are an inappropriate attempt to relitigate and recast their previously rejected arguments and evidence." The district court modified the award of post-judgment interest but otherwise denied the motion, finding "no reason to alter its ruling":

> This was a business relationship that can best be described as an absolute nightmare. . . . The bookkeeping was a catastrophe -- an accounting fiasco of which [Gascoyne CEO William] Pladson took advantage. How income, expenses, draws and per diems were treated for bookkeeping purposes was conflicting and irreconcilable. . . . The arguments presented in the motion are a regurgitation of the multitude of issues presented during the course of litigation. . . . This was a highly combative and contentious lawsuit. The award of damages was clearly within the range of the evidence presented at trial, and does not amount to a "plain injustice" or a "shocking result."

Buchl, No. 1:17-cv-00048, Order (D.N.D. Sep. 21, 2022). Gascoyne appeals. Ignoring our applicable standard of review, Gascoyne argues the district court made five material errors in calculating the profits due Plaintiffs and erred in awarding prejudgment interest and costs. Asserting that correcting those five errors would establish that it overpaid Plaintiffs, Gascoyne urges us to "remand with instructions to enter judgment consistent with this court's opinion." Applying our deferential standard of review of district court findings after a bench trial, we affirm all but $14,650 of the award of contract damages and the award of costs, reverse the grant of prejudgment interest, and remand for entry of an amended judgment.

## I. The Calculation of Gascoyne Underpayments

In this diversity action, we apply the substantive law of North Dakota. As the district court recognized, central to this dispute are the terms of an oral contract that

-3-

was never reduced to writing during the course of the parties' six year relationship. Under North Dakota law, the terms of an oral contract are questions of fact. See Tallackson Potato Co., Inc. v. MTK Potato. Co., 278 N.W.2d 417, 421-22 (N.D. 1979). And the award of contract damages is a question of fact. Tergesen v. Nelson Homes, Inc., 969 N.W.2d 150, 156 (N.D. 2022); cf. Miller v. Mills Constr., Inc., 352 F.3d 1166, 1174 (8th Cir. 2003). Following a bench trial, "we review the district court's fact finding for clear error, and we review legal conclusions and mixed questions of law and fact de novo." Roemmich v. Eagle Eye Dev., LLC, 526 F.3d 343, 353 (8th Cir. 2008) (quotation omitted). Under North Dakota law:

> A district court's finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, on the entire record, a reviewing court is left with a definite and firm conviction a mistake has been made. . . . [W]e view the evidence in the light most favorable to the findings and will not reverse the district court's findings simply because we may view the evidence differently. In a bench trial, the district court determines the credibility of witnesses, and we do not second-guess those credibility determinations.

Tornabeni v. Wold, 920 N.W.2d 454, 458 (N.D. 2018) (quotation omitted); cf. Fed. R. Civ. P. 52(a)(6). We apply this deferential standard in reviewing Gascoyne's challenges to "specific portions of the damages allowed" in breach-of-contract litigation. Apex Mining Co. v. Chicago Copper & Chem. Co., 340 F.2d 985, 986-87 (8th Cir. 1965).

**A. The Contract.** The district court found that the oral contract at issue "mirrored the terms" of the parties' relationship in Gascoyne's Tesoro Turnaround Project in 2010, in which Buchl worked as project manager and Gascoyne agreed to split the profits with Buchl. In the contract at issue:

18) Gascoyne hired the Plaintiffs as independent contractors to work as project managers of the GMHR Field Services division of Gascoyne. . . . There was never a written agreement between the parties which was . . . one of the primary causes of this nightmare of a business relationship. The original agreement or understanding was that the Plaintiffs would be compensated for their services with 50 percent of the net profits generated from GMHR Field Services work. . . . [W]hile Gascoyne would make monthly payments to the Plaintiffs, these were considered to be advances against the Plaintiffs' 50 percent share of the profits. If there were additional profits beyond the advance at the end of a given year, Gascoyne agreed to make additional lump sum profit payments.

19) The parties operated along these lines for years. . . . While the Plaintiffs had some disagreements with Pladson regarding the inclusion of several overhead items in the annual profit calculations, those disagreements were not major in the early years. . . . [E]veryone made money.

20) . . . To accomplish this 50/50 split of the profits, the monthly payments to the Plaintiffs were to be treated as advances.

21) . . . [T]he Plaintiffs testified . . . they understood their monthly "salary" would be "against any outstanding or future profit sharing."

22) . . . Gascoyne testified that "They were to receive 50 percent of the net profits and subtract any draws that they had received prior [] from their 50 percent."

31) It is clear from the record the parties intended GMHR Field Services to be a long-term entity of Gascoyne. The parties intended to split the profits of GMHR Field Services on an annual basis. The parties made their profit-sharing

calculations and disbursements after regular, annual Reconciliation periods, and the business was profitable.

34) . . . The [monthly] payments were originally $4,000 per month in 2011, but grew to $6,000 per month in 2012, and evolved into $7,500 of "monthly pay" and $3,500 "per diem" by 2013.

52) Unlike the first Tesoro Turnaround Project in 2010, Pladson did not permit the same degree of financial transparency in order for the Plaintiffs to verify profit sharing, revenue, claimed expenses.

55) . . . The undisputed evidence reveals that Pladson alone decided what the revenue/income and expenses were for GMHR Field Services each year; that he alone determined what the 50/50 split of profits would be; and the annual Reconciliation statements or breakdowns were not based on sound accounting principles, standard business practices, or even common sense.

57) . . . [The parties] agreed that once a reconciliation period ended, they intended to start a new Reconciliation period at zero dollars in terms of both profits and expenses.

163) The original intent of the parties at the time of the creation of the Reconciliation Statements by Pladson was to ensure that once a time period of profits were split 50/50 between Gascoyne/Pladson and the Plaintiffs, they would start again at scratch.

164) For purposes of the Court's profit-sharing calculations, the monthly draws, and all profit-sharing payments received by the Plaintiffs . . . should not be treated as an expense item and a subsequent deduction from the profit-sharing calculations each year.

217) It is undisputed, and the parties agreed at trial, that the Plaintiffs were not to share in the losses of GMHR Field Services.

218) The Court heard no testimony . . . that Gascoyne/Pladson had sought or received a payback of losses from the Plaintiffs for the 2016 Reconciliation period. The Court finds . . . no conduct or evidence presented to support a cumulative profit-sharing agreement from 2011-2016.

**B. The Underpayments.** The district court then determined, in lengthy, detailed Findings of Fact, GMHR Field Services' total revenue, total expenses, net income, Plaintiffs' 50% share, the total paid to Plaintiffs, and the underpayment for each Reconciliation period -- 2011-13, 2014, 2015, and 2016. The parties had "minimal" disputes over the annual revenue or income of GMHR, except for a major dispute over the way Pladson/Gascoyne "assigned" a revenue value for several "internal projects," including a "Frac Sand" project, that generated no "actual" revenue, in determining Plaintiffs' 50% of GMHR Field Services' net profits. See p. 13-14 *infra*. Rather, the court observed, the "heart of the dispute" was Pladson's determination -- with no input or approval from Plaintiffs -- of GMHR Field Services expenses -- both categories and amounts -- that should reduce GMHR Field Services' profit, and therefore Plaintiffs' 50% share, in each Reconciliation period.

Based on these detailed findings, the district court in paragraph 301 summarized its underpayment findings in the following chart and incorporated these findings in its conclusions of law:

|  | 2011-2013 | 2014 | 2015 | 2016 | Total Under-Payment |
|---|---|---|---|---|---|
| Total Revenue | $7,744,846 | $6,068,914 | $6,457,778 | $3,038,884 |  |
| Total Expenses | $5,707,385 | $5,049,909 | $5,044,690 | $3,155,835 |  |
| Net Income (Loss) | $2,037,461 | $1,019,005 | $1,413,088 | -0- |  |
| Plaintiffs' 50% Share | $1,018,730 | $509,503 | $706,544 |  |  |
| Total Paid to Plaintiffs | $754,000 | $348,578 | $310,000 |  |  |
| Under Payment | $264,730 | $160,925 | $396,544 | -0- | $822,199 |

**C. Gascoyne's Arguments on Appeal.** Without identifying specific findings that are clearly erroneous, except the ultimate underpayment findings, Gascoyne argues the district court "committed five clear errors in calculating profits due." This frustrates appellate review. See Fed. R. App. P. 10(b)(2). "We cannot tell whether the district court erred in a ruling if [the appellant] does not direct us to a place in the record where we can find it." Singer v. Harris, 897 F.3d 970, 980 (8th Cir. 2018) (quotation omitted). Of particular importance, Gascoyne does not challenge the findings in which the district court defined the terms of the oral contract.

Because Gascoyne repeats fact-intensive arguments made to the district court at trial and in the motion to alter or amend, certain well-established aspects of our deferential standard of review are also important. First, to the extent Gascoyne objects to the district court's failure to make findings, "[i]t is well established that a

-8-

district court need not make specific findings on all facts but only must formulate findings on the ultimate facts necessary to reach a decision. Tamko Roofing Prods., Inc. v, Smith Eng'g. Co., 450 F.3d 822, 829 (8th Cir. 2006) (quotation omitted). Second, to conclude that a finding is clearly erroneous, we must be "left with the definite and firm conviction that a mistake has been omitted." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948). Third, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." IPSCO Tubulars, Inc. v. Ajax TOCCO Magnathermic Corp., 779 F.3d 744, 747 (8th Cir. 2015), citing Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985).

(1) The first and third of the five alleged "clear errors in calculating profits due" involve the 2016 Reconciliation period in which the district court found there were no profits and therefore no underpayment to Plaintiffs. In paragraphs 45 and 46 of its Findings of Fact, the district court found that Plaintiffs each received "profit-sharing checks from Gascoyne" totaling $48,947.60 in February 2016 and $200,000 in April 2016. Buchl, 2022 WL 7739567, at *5-6. In addition, Plaintiffs each received $11,000 monthly payments in 2016 and January 2017. Gascoyne argues the court clearly erred by not including these payments in its ultimate finding that there were a total of $822,199 of underpayments in the four Reconciliation periods. In our view, the terms of the oral contract as found by the district court require a separate analysis of the two types of payments.

(a) Profit-Sharing Payments. Both parties acknowledged that Plaintiffs received $248,947.60 in profit-sharing payments in 2016, Gascoyne in its Proposed Findings of Fact, and Plaintiffs in their post-trial brief. Plaintiffs' Exhibits 9 and 10 were reports of all Gascoyne's payments to Buchl and Chatinover in the years in question. The $48,947.60 in payments in February 2016 were reported as "Commission/Bonus." The $200,000 of payments in April 2016 were reported as "Commission/Bonus for 2015." In awarding prejudgment interest, the district court

found, citing Exhibits 9 and 10, that the February payments were attributable to the 2014 Reconciliation period, and the April payments were attributable to the 2015 Reconciliation period. That is consistent with the court's finding that, under the oral contract, if there were additional profits beyond the monthly advances at the end of a given year, "Gascoyne agreed to make additional lump sum profit payments." And Plaintiffs' post-trial Proposed Findings of Fact included findings that the February and April 2016 payments were "profit-sharing checks," unlike the regular monthly payments.

So the question is, were these 2016 lump sum payments included in the amounts "paid to Plaintiffs" in the court's determination of the underpayments during the profitable years of the relationship prior to 2016? Gascoyne's briefs on appeal point to no record evidence as establishing this fact -- in effect, it is a "take my word for it" argument. The district court's lengthy findings do not include a subsidiary finding itemizing the payments to Plaintiffs it included in determining the underpayments in each Reconciliation period. But subsidiary findings are not required. The district court's ultimate underpayment findings are clearly erroneous only if our review of the record leaves us with "a definite and firm conviction a mistake has been made." Tornabeni, 920 N.W.2d at 458. Here, to the contrary, we find ample evidence the district court did not make a mistake in calculating the underpayments in accordance with the terms of the oral contract it found.

The answer was hard to find because Plaintiffs, rather than respond to a serious factual issue, simply tell us the district court's "interconnected findings as to damages, in light of the record, are plausible and supported by the greater weight of the evidence."[3] Appendix 1 to Plaintiffs February 2022 Proposed Findings of Fact

---

[3]This denied the district court an effective defense and left us to search a massive record on our own, which will be highly relevant if attorneys' fees are sought for this appeal.

contains a chart supporting their proposed ultimate finding of $1,507,251.48, the total underpayments found by the district court in the chart set forth above. Appendix 1 listed each "Payment Made to Jay and Chat" in the three profitable Reconciliation periods. The payments listed in the 2015 column include the $248,947.60 of payments made in February and April 2016. Those payments and the other listed "Payments to Jay and Chat" were subtracted from the "50% Profits to Jay and Chat" in the profitable Reconciliation periods, resulting in "Total Damages 2011 thru 2015" of $1,507,251.52, four cents more than the proposed finding it supported and the district court ultimately adopted. Therefore, we conclude, Gascoyne has failed to establish this alleged "clear error in calculating profit due." Regarding these profit-sharing payments, the district court's calculation of total underpayments was consistent with the unchallenged terms of the oral contract found by the court.

(b) <u>Monthly Payments.</u> Whether the district court clearly erred in failing to deduct $286,000[4] of monthly advances to Plaintiffs in 2016 and 2017 from the total underpayments in earlier profitable Reconciliation periods because there were no profits in the later years is a very different issue. Terms of the oral profit-sharing contract found by the district court resolve this issue: (I) Plaintiffs were to be paid monthly compensation, as one would expect whether they were employees or independent contractors; (ii) Plaintiffs' entire compensation would be 50% of the GMHR Field Services profit, consisting of the monthly payments (advances) plus lump sum profit-sharing payments at the end of the Reconciliation period if required to satisfy Gascoyne's 50% profit-sharing commitment; (iii) when a Reconciliation period ended, the parties "intended to start a new Reconciliation period at zero dollars in terms of both profits and expenses" (in other words, the profit-sharing was not on a "cumulative" basis); (iv) "the parties intended for GMHR Field Services to be a long-term entity of Gascoyne;" and (v) Plaintiffs did not share any losses. <u>See</u> <u>Buchl</u>,

---

[4]This sum includes both the advances on profits as well as "per diem" payments, which we discuss in the next subpart of the opinion.

2022 WL 7739567, at \*3-5, 24. The district court made no finding of the parties' intent regarding monthly advances paid in a year that ultimately resulted in no GMHR Field Services profit.

The district court's ultimate findings regarding the 2016 payments are consistent with these terms. Plaintiffs were owed the monthly payments when made but were owed no lump sum profit-sharing payments because the year proved to be unprofitable. Gascoyne acknowledges that Plaintiffs' share of profits in the earlier Reconciliation periods was not affected by the lack of profits in 2016. But it argues that 2016 payments must be applied to *offset* its underpayment obligations in the earlier periods. That is inconsistent with the parties agreement "to start a new Reconciliation period at zero dollars in terms of both profits and expenses" at the end of each Reconciliation period. When a period ended, Plaintiffs were entitled to their share of the profits for that period, regardless of under or overpayments in future periods. Under this oral contract, Plaintiffs need not return monthly advances paid in a year that produces no profits.

At first blush, it seems illogical if not unfair for Plaintiffs to keep monthly payments when there were no profits. Maybe so in many more typical profit-sharing agreements. But this was not an illogical way for the parties to structure this relationship. Gascoyne needed project managers for its work in the oil fields. Plaintiffs wanted monthly payments for their work and a share in the profits, but would not agree to share losses. This oral agreement provided Plaintiffs monthly payments that were included in calculating their share of the profits. The parties intended a long-term, profitable relationship. Monthly payments made in years that proved to be unprofitable were not unearned or a windfall and should not "offset" Gascoyne's breach of its profit-sharing obligations in prior years. If the parties wanted to avoid this judicial interpretation of the way they did business in subsequent breach of contract litigation, they should have negotiated a different written agreement "before the storm." This was not a clear error in calculating profit due.

-12-

(2) The second alleged clear error in calculating profit due is the district court's failure to include $243,000 in payments to Plaintiffs in profitable Reconciliation periods that were labeled "per diem," as amounts paid under the parties' 50/50 profit-sharing agreement. This issue arose after the start of the profit-sharing agreement. During most of the 2011-2013 Reconciliation period, Gascoyne paid each Plaintiff's monthly advances in a single check. Beginning in April 2013, at Buchl's request (apparently because he erroneously believed it would affect the amount of his taxable compensation), Gascoyne began paying each Plaintiff in two checks per month, $7,500 of "monthly pay" and $3,500 of "per diem." Buchl, 2022 WL 7739567, at *6. Gascoyne argues "[t]he District Court's express holdings that the monthly payments would be advances or draws against profits requires that these 'per diem' monthly payments be so treated."

At trial, this issue was the subject of conflicting and internally inconsistent opinions by competing expert witnesses and by the parties' fact witnesses. Obviously, per diem reimbursement of expenses might be treated differently than monthly compensation in the taxation of Plaintiffs' independent businesses, and Gascoyne might well be willing to put a favorable "foot on the scale" to benefit its managers. But recharacterizing part of the agreed monthly payments to provide Plaintiffs a tax benefit would not necessarily control how to treat the payments under the oral profit-sharing agreement. On this question, the district court was besieged with conflicting opinions and testimony of questionable credibility. Gascoyne points to evidence suggesting that per diem payments were to be treated as advances on profit. But there is evidence suggesting otherwise. Given the absence of detailed subsidiary findings, it is apparent (but not crystal clear) the district court did not include per diem payments in determining whether Plaintiffs were paid 50% of the profits in the profitable periods. Because "there are two permissible views of the evidence [on this issue], the factfinder's choice between them cannot be clearly erroneous." IPSCO Tubulars, 779 F.3d at 747.

(3) The fourth alleged clear error in calculating profit due is the district court's alleged failure to account for $29,300 in expenses for the Frac Sand project, which would reduce Plaintiffs' 50% of the GMHR Field Services profits by $14,650. Gascoyne argues the district court "looked solely to the analysis of Gascoyne's accountant" to determine expenses associated with the Frac Sand project, yet neglected to include $29,300 identified by the accountant.

The district court addressed Frac Sand revenues and expenses in paragraphs 72-79 of its Findings of Fact. Buchl, 2022 WL 7739567, at *8-9. A Gascoyne accountant testified that Gascoyne "capitalized" Frac Sand expenses for tax purposes and therefore they were not included in the 2014 Reconciliation Statement. Experts for both parties agreed that the Frac Sand project involved three categories of expenses: direct labor ($239,389.63), direct costs ($349,247.10), and per diem expenses ($29,300). The district court cited these reports but found that $588,636.73 in GMHR Field Services expenses must be included "to properly determine actual profits for the 2014 Reconciliation Statement year." That amount is the sum of direct labor and direct cost expenses but omits the undisputed expense for per diem payments.

The district court offered no explanation for why the per diem payments should be excluded. On appeal, Plaintiffs argue "the so-called 'mathematical error' here amounts to the District Court choosing between two views of the evidence, which cannot amount to clear error." But that principle only applies "where there are two permissible views of the evidence." IPSCO, 779 F.3d at 747. Here, Plaintiffs do not point to evidence establishing "two permissible views" of this issue, and none is apparent on our review of this massive record on which almost everything else was contentiously controverted. If the per diem expenses had been properly included, then the total profits would have been reduced by $29,300, and the court should not have awarded Plaintiffs a fifty-percent share of that amount.

-14-

(4) Gascoyne's fifth alleged clear error in calculating profit due is that the district court relied on an "incomplete lay reconciliation" produced by Pladson in calculating profits for the last two years of the 2011-2013 Reconciliation period, rather than Gascoyne's expert accountant's calculations, despite finding that Pladson lacked accounting experience and his bookkeeping was shoddy. This contention is without merit.

The district court's decision whether to accept an expert's calculation of profits is a credibility determination. See Fed. R. Civ. P 52(a)(6) ("the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility"). As Gascoyne acknowledges, the district court did not simply accept the figures in Pladson's reconciliation; it adjusted and eliminated items it found not credible. Experts are not infallible. The court's decision not to rely on an expert opinion is not clear error unless it leaves us with a definite and firm conviction a mistake has been made. Here, we doubt the alleged mistake was made. We must view the evidence in the light most favorable to the district court's findings and may not second-guess its credibility determinations. There was no clearly erroneous calculation of profit due for the 2011-2013 Reconciliation period.

Given our conclusion that Gascoyne has failed to establish that the district court erred in determining the significant underpayments Gascoyne owed, the district court's assessment of costs must also be affirmed.

## II. Prejudgment Interest

Gascoyne argues the district court erred in awarding Plaintiffs prejudgment interest. A district court's authority to grant prejudgment interest is a legal question we review *de novo*. Child.'s Broad. Corp. v. Walt Disney Co., 357 F.3d 860, 868 (8th Cir. 2004). Under North Dakota law, "[e]very person who is entitled to recover damages certain or capable of being made certain by calculation, *the right to recover*

*which is vested in the person upon a particular day*, also is entitled to recover interest thereon from that day." N.D. Cent. Code § 32-03-04 (emphasis added); see Tergesen, 969 N.W.2d at 156-57. Here, both parties in their post-trial submissions argued they were entitled to breach-of-contract damages *and* prejudgment interest.

The district court dismissed Gascoyne's breach-of-contract counterclaim and awarded Plaintiffs prejudgment interest from the date of underpayment following each Reconciliation period, concluding these damages were "certain or capable of being made certain" under the statute. Buchl, 2022 WL 7739567, at *47-48. Gascoyne argued the damages award was not "certain or capable of being made certain by calculation" in its motion to alter or amend. The district court rejected this argument, concluding "clearly prejudgment interest is permissible." We disagree.

In applying the North Dakota prejudgment interest statute, we have held that contract damages are not certain or capable of being made certain when the contract "defie[s] ready interpretation as to damages upon breach." Koch Hydrocarbon Co. v. MDU Res. Grp., Inc., 988 F.2d 1529, 1534-40, 1548 (8th Cir. 1993). That case turned on the interpretation of natural gas purchase and sales contracts that were ambiguous as to key terms, including price; we affirmed the denial of prejudgment interest. Similarly, in BancInsure, Inc. v. BNC National Bank, N.A., 263 F.3d 766 (8th Cir. 2001), we affirmed the district court's denial of prejudgment interest to a bank that prevailed in a dispute with the insurer that issued a financial institution bond. The parties disputed "how much loss was covered and what computation methods should be used to determine the amount." Id. at 774. We held that damages are not a "sum certain" when the court must "resolve . . . factual and legal complexities . . . to reach a determination." Id. By contrast, "the balance of the purchase price for the home" is a sum certain. Tergesen, 969 N.W.2d at 156.

In this case, the parties agreed that Plaintiffs were entitled to 50% of GMHR Field Services net profits and disagreed on almost every other issue, as the district

court's 103-page Findings of Fact and Conclusions of Law and its order denying the motion to alter and amend reflect. The district court had to resolve a host of issues central to the deal, including how to characterize payments made to Plaintiffs and how to calculate whether there were underpayments or overpayments under the oral contract. Plaintiffs' contract damages were not certain, and were not capable of being made certain by calculation, without the district court's findings and conclusions, made after an eight-day trial. Plaintiffs' right to recover underpayments was not *vested* until the day the district court ruled, so the statute does not apply.

We reject Plaintiffs' contention that, because Gascoyne sought prejudgment interest as part of its counterclaim, the doctrine of judicial estoppel bars it from challenging the award of prejudgment interest to Plaintiffs. It is hardly surprising that both parties sought prejudgment interest on their contract damage claims and then the loser contests the award of prejudgment interest on the prevailing party's claim. Lawyers can label the two positions inconsistent. But to trigger the doctrine of judicial estoppel under federal law, there must be a clear inconsistency, and courts consider whether the party being estopped "succeeded in persuading a court to accept [an] earlier position," and "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001); see Kirk v. Schaeffler Grp. USA, Inc., 887 F.3d 376, 383 (8th Cir. 2018). Neither of those factors is satisfied here. While the North Dakota law of judicial estoppel is sparse, the Supreme Court of North Dakota looks to federal law in applying the doctrine. See Broten v. Broten, 863 N.W.2d 902, 907 (N.D. 2015). We reverse the award of prejudgment interest.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is reversed in part and the case is remanded with directions to enter an amended judgment that reduces

the judgment by $14,650 and eliminates the award of prejudgment interest.  In all other respects, the judgment of the district court is affirmed.

_____